**Lara ANTKOWIAK, by her parent and natural guardian, John M. ANTKOWIAK, Plaintiff,**

v.

**Gordon AMBACH, as Commissioner of the New York State Education Department, Defendant.**

**No. CIV–85–532C.**

United States District Court, W.D. New York.

July 11, 1986.

Bouvier, O'Connor, Cegielski & Levine (Bruce A. Goldstein, of counsel), Buffalo, N.Y., for plaintiff.

Robert Abrams, Atty. Gen. (Peter B. Sullivan, Asst. Atty. Gen., of counsel), Buffalo, N.Y., for defendant.

CURTIN, Chief Judge.

The issue in this case is whether the State of New York is required, pursuant to the Education for the Handicapped Act, 20 U.S.C. § 1400, *et seq.* [EHA], or the Rehabilitation Act, 29 U.S.C. § 794, to pay for the placement of a 13-year-old girl at a private institution in Pennsylvania. The child, Lara Antkowiak, suffers from anorexia nervosa and a variety of emotional problems. In May of 1985, Lara's father, John M. Antkowiak, unilaterally placed his daughter at the Hedges Treatment Center of the Devereux Foundation in Malvern, Pennsylvania [Hedges]. Defendant, the Commissioner of the State Education Department [the Commissioner] maintains that the State has no obligation under law to fund Lara's stay.

Currently under consideration is plaintiff's motion for full or partial summary judgment. Plaintiff maintains that defendant had no authority, under federal law, to review part or all of an impartial hearing officer's decision which was fully favorable to plaintiff. The Commissioner's position is that he has the right to reconsider all issues addressed by the hearing officer. Oral argument was heard on the motion on May 2, 1986.

The procedural history of this case is complex and reflects the court's efforts to obtain the views of State educational authorities within the confines of the EHA. To summarize, in January of 1985, the Buffalo City School District Committee on the Handicapped [COH] determined that Lara was not educationally handicapped and would not need any special education ser-

vices. On February 27, 1985, the COH changed its recommendation, finding that Lara suffered from an educational handicap. It prepared an Individualized Educational Program [IEP] designed to meet her needs (*see* Item 3, Exh. D). She was found to require residential placement.

Applications were made to six residential programs in New York State, but all six refused to accept Lara. In March of 1985, the COH sought the Commissioner's approval to contract with Hedges. On April 17, 1985, the State Education Department notified the COH that Lara's application could not be approved because Hedges had been removed from the Commissioner's approved list of residential out-of-state schools.

Plaintiff then filed this lawsuit, seeking an injunction ordering the Commissioner to place Lara at Hedges. At this time, the COH was investigating three alternative placements. I found that plaintiff had failed to pursue the matter to decision before the COH and, if necessary, to obtain a due process hearing. Plaintiff was ordered to exhaust his administrative remedies (Decision and order of November 5, 1980). At the court's request, plaintiff submitted an affidavit detailing his financial status as well as affidavits from officials at Hedges. There was no immediate danger that Lara would be released from Hedges for failure to pay.

Plaintiff then sought a due process hearing through the local Board of Education pursuant to New York State Education Law § 4404(1).[1] The hearing officer agreed with the conclusions of the COH and ordered Lara's placement at Hedges (Appendix 1).

It should be noted that Lara's parents and the school district stipulated that Lara should be classified as emotionally disturbed. The hearing officer heard testimony from two psychologists and, based upon this and the stipulation, concluded that Lara fit the definition of emotionally disturbed and was in need of educational assistance. Lara was found to be unable to succeed in a regular classroom (Appendix 1, p. 1576). Her parents and the school district also stipulated that Lara needed residential placement at Hedges. However, as the hearing officer herself noted:

> Ordinarily, a hearing officer does not have authority to order the placement of a child at a residential educational program that is not currently on the State Education Department's list of approved residential placements.

(Appendix 1, p. 1578.)

In early 1986, the State Education Department informed the school district that Lara's placement at Hedges could not be approved. The district was told that Hedges was currently approved only for children aged 14 or older, and the day school was not approved. Plaintiff renewed his motion for an injunction before this court.

The defendant again urged that plaintiff had failed to exhaust, since plaintiff had not sought a review by the Commissioner. The EHA provides that *aggrieved parties* to a hearing must be permitted to appeal; if there is no such appeal, the decision of a hearing officer is final. 20 U.S.C. § 1415(c) and (e)(1). In light of these provisions, I found that the plaintiff had exhausted his remedies as required by the EHA (Decision and order of February 3, 1986).

1. New York Education Law § 4404(1):
   · If the recommendation of the committee on the handicapped is not acceptable to the parents or guardians of a child, or if the committee fails to make a recommendation within such period as may be required by regulations of the commissioner, such parents shall notify the board of education of this situation and the board shall appoint an impartial hearing officer to hear the appeal and make a recommendation to the board of education within such period of time as the commissioner by regulation shall determine. Individuals so appointed by a board of education shall be selected from a list of those who have successfully completed a hearing officer training program conducted by the department according to the regulations of the commissioner. A record of proceedings before the hearing officer shall be maintained and made available to the parties. An appeal to the commissioner of education will lie from any determination of the board of education.

However, defendant was given an opportunity to explain his position regarding New York Education Law §§ 310[2] and 4404(2),[3] which the Commissioner maintained would permit him to institute an appeal on his *own* motion, *citing Sidney v. Ambach*, No. 4322–85 (N.Y.S.Sup.Ct., Albany County, January 21, 1986). In *Sidney K.*, the court discussed sections 310 and 4404(2), noting that it permits the Commissioner to take his own administrative appeal when he disagrees with the local school district. There, the court implied that, under state law, the Commissioner may review all issues. In view of this case,

the Commissioner was given an opportunity to explain his position under section 310; his response was to issue an order to show cause why the decision of the hearing officer should not be annulled.

Although plaintiff had exhausted the procedures required under the EHA, I declined to take any further action pending the Commissioner's review (Decision and order of February 27, 1986). In reaching that decision, I noted that, pursuant to New York State law, the State Education Department must approve any out-of-state private placements. N.Y.Educ.Law §§ 4401(2)[4] and 4402(2)(B)(2) and (3).[5] I

**2.** New York Education Law § 310:

Any party conceiving himself aggrieved may appeal by petition to the commissioner of education who is hereby authorized and required to examine and decide the same; and the commissioner of education may also institute such proceedings as are authorized under this article. The petition may be made in consequence of any action:

\* \* \* \* \* \*

7. By any other official act or decision of any officer, school authorities, or meetings concerning any other matter under this chapter, or any other act pertaining to common schools.

**3.** New York Education Law § 4404(2):

Review by the commissioner of education. The commissioner of education shall review and modify, in such cases and to the extent that the commissioner deems necessary, in order to properly effectuate the purposes of this article, any determination of the board of education or trustees of a school district relating to the determination of the nature of a child's handicapping condition selection of an appropriate special educational program or service and the failure to provide such program and require such board to comply with the provisions of such modification in the same manner provided for the taking of appeals pursuant to the provisions of section three hundred ten of this chapter; provided, however, that in no event shall any fee or charge whatsoever be imposed for any appeal taken pursuant to this subdivision.

**4.** New York Education Law § 4401(2):

"Special services or programs". For purposes of this article, special services or programs shall mean the following:

\* \* \* \* \* \*

e. Contracts with private non-residential schools which have been approved by the commissioner and which are within the state for special services or programs.

f. Contracts with private non-residential schools which have been approved by the commissioner and which are outside of the state for special services or programs.

g. Contracts with private residential schools which have been approved by the commissioner and which are within the state for special services or programs.

h. Contracts with private residential schools which have been approved by the commissioner and which are outside the state for special services or programs.

**5.** New York Education Law § 4402(2)(b)(2) and (3):

\* \* \* \* \* \*

All contracts with schools pursuant to the provisions of paragraphs d, e, f, g, h, l, and m of subdivision two of section forty-four hundred one of this article shall be subject to the approval of the commissioner. All contracts under paragraph c of subdivision two of section forty-four hundred one shall be made in accordance with the provisions of subdivision four of section nineteen hundred fifty of this chapter. No child shall be placed in a residential school nor shall a board recommend placement in a residential facility specified in paragraph j of subdivision two of section forty-four hundred one unless there is no appropriate nonresidential school available consistent with the needs of the child. The board shall provide written notice of its determination to the parent or legal guardian of such child. If the determination of the board of education is not consistent with the recommendations of the committee on the handicapped, such notice shall include the statement of the reasons for such determination which shall identify the factors considered by the committee on the handicapped in its evaluation.

(3) If the board cannot secure an appropriate special service or program within the state to meet the needs of the child, they shall notify the commissioner.

also noted that Lara's placement had been declined based on the limited approval given by the State of New York to the Hedges facility. For these reasons, some review by the Commissioner seemed appropriate. Furthermore, pursuant to 20 U.S.C. § 1413(a)(4)(B), the educational agency of a state receiving funds under the EHA has the duty to ensure that private facilities met state educational standards. At that time, I did not discuss which issues the Commissioner could review consistent with federal law.

Plaintiff takes the position that the Commissioner's decision, issued March 14, 1986, should be annulled. The Commissioner determined that Lara had no "educationally handicapping condition." He also found that there was "an absence of any meaningful description of the proposed educational program the student would receive while placed at the Hedges Treatment Center...." In light of these findings, the Commissioner ordered the Board of Education for the City of Buffalo to reconvene the COH for further proceedings in accordance with his decision (Appendix 2).

The court notes that plaintiff initially urged that no review by the Commissioner was proper. Plaintiff now, without retreating from that position, urges that even if *some* review was proper, the scope of review undertaken by the Commissioner is proscribed by the EHA. Defendant maintains that the Commissioner has the authority to undertake a complete review of all aspects of the case.

Plaintiff's key point is that the findings of the COH and the hearing officer are final as to whether Lara has an educational handicap and as to the Individualized Educational Plan developed by the COH to meet Lara's needs. Plaintiff urges that

this finality is assured by federal law, *citing* 20 U.S.C. § 1415(e)(1) and 34 C.F.R. § 300.511. Of course, as plaintiff notes, in the event of a conflict between State and federal law, federal law is supreme.

The EHA contemplates a cooperative effort among parents, teachers, and local boards of education. Together, they have the task of developing an IEP which is designed to enable the handicapped child to obtain the "free appropriate public education" guaranteed by the EHA. 20 U.S.C. § 1401(19); *Hendrick Hudson Board of Education v. Rowley*, 458 U.S. 176 at 181–182, 102 S.Ct. 3034 at 3037–38, 73 L.Ed.2d 690 (1982). In New York State, the local Board of Education establishes a committee on the handicapped composed of at least a school psychologist, a teacher or administrator of special education, a school physician, and a parent. The committee must invite the appropriate professionals most familiar with the child's handicap to attend any meeting concerning that child's IEP. N.Y.Educ.Law § 4402(1)(b)(1).

Under the EHA, a state must provide parents with an opportunity to present complaints and, ultimately, an opportunity for a due process hearing. Parents who are dissatisfied with any aspect of their child's classification or placement must first resort to these procedures. 20 U.S.C. § 1415(b)(1) and (2). The hearing may be conducted by the state educational agency or by a local educational agency; the choice is left to the state. 20 U.S.C. § 1415(b)(2).[6]

The State of New York has chosen to offer parents a due process hearing at the local level. N.Y.Educ.Law § 4404(1). Pursuant to the EHA, the decision of the hearing officer is final unless an aggrieved party to the hearing chooses to appeal. 20 U.S.C. § 1415(c)[7] and (e)(1).[8]

---

6. 20 U.S.C. § 1415(b)(2):
    Whenever a complaint has been received under paragraph (1) of this subsection, the parents or guardian shall have an opportunity for an impartial due process hearing which shall be conducted by the State educational agency or by the local educational agency or intermediate educational unit, as determined by State law or by the State educational agency. No hearing conducted pursuant to the

requirements of this paragraph shall be conducted by an employee of such agency or unit involved in the education or care of the child.

7. 20 U.S.C. § 1415(c):
    If the hearing required in paragraph (2) of subsection (b) of this section is conducted by a local educational agency or an intermediate

After oral argument was heard, the court telephoned counsel for each of the parties requesting any further information they could provide as to the legislative histories of the EHA and the pertinent sections of the New York State Education Law. It was hoped that further light could be shed upon N.Y.S.Educ.Law §§ 310 and 4401, *et seq.*, particularly § 4404(2), and how these sections mesh with the requirements of the EHA. Nothing pertinent was submitted by the defendant, and the court's own search has not proved illuminating.

Plaintiff cited a section of the legislative history of the EHA which lends some support to his position. The House bill would have provided for a report to be made at the local level and forwarded to the state educational agency. A hearing would have been available at the level of the state educational agency. It is not clear whether a hearing would have also been available at the local level. According to the House

bill, the state educational agency was to be permitted to review any "action" by the local agency on its own motion:

> The State educational agency, upon appeal by an aggrieved party or on its own motion shall review the action of the local agency and conduct an investigation of the factual circumstances relating to the complaint, attempt to resolve the matter (by informal methods), and, upon a finding (after reasonable notice and opportunity for a hearing) that a local educational agency has failed to comply with any provision of this part, shall take whatever steps necessary to correct such failure....

*1975 U.S.Code Cong. and Ad.News*, Vol. 2, pp. 1425, 1500–01.[9]

No similar provision appeared in the Senate bill, and the conference substitute did not include any such provision. The conference substitute adopted the procedures

---

educational unit, any party aggrieved by the findings and decision rendered in such a hearing may appeal to the State educational agency which shall conduct an impartial review of such hearing. The officer conducting such review shall make an independent decision upon completion of such review.

8. 20 U.S.C. § 1415(e)(1):

A decision made in a hearing conducted pursuant to paragraph (2) of subsection (b) of this section shall be final, except that any party involved in such hearing may appeal such decision under the provisions of subsection (c) and paragraph (2) of this subsection. A decision made under subsection (c) of this section shall be final, except that any party may bring an action under paragraph (2) of this subsection.

9. Below are the full provisions of the House bill:

(1) Any local educational agency receiving assistance under this part shall establish a grievance procedure that will offer an opportunity for handicapped children and their parents or guardian to present complaints with respect to the manner in which the handicapped child involved is receiving special education and related services;

(2) Upon receipt of a complaint, the local educational agency shall conduct an investigation, and upon completion of such investigation, transmit a report (including a description of any recommendation or disposition made) to the State educational agency;

(3) The State educational agency, upon appeal by an aggrieved party or on its own motion shall review the action of the local agency and conduct an investigation of the factual circumstances relating to the complaint, attempt to resolve the matter (by informal methods), and, upon a finding (after reasonable notice and opportunity for a hearing) that a local educational agency has failed to comply with any provision of this part, shall take whatever steps necessary to correct such failure;

(4) Any person participating in a hearing conducted by a local educational agency and the State educational agency shall have the right to be accompanied and advised by counsel and by individuals with special knowledge or training and skills with respect to handicapped children;

(5) The State educational agency shall take its findings and determinations into account during its review of any application for funds under this part made by the local educational agency involved and shall submit a report of its findings and determinations (and a description of any action taken thereon) regarding any complaint to the Commissioner of Education; and

(6) Actions may be brought in the district courts of the United States to appeal the determinations of the State educational agency and in such actions the findings of fact of the State educational agency shall be conclusive if supported by substantial evidence and the district courts may remand the case to the State agency to take additional evidence.

eventually provided in the Act itself. *Id.* at 1502–03. The provisions in the House bill indicate that Congress considered permitting the educational agency of a state to review any local decision, but rejected this approach in favor of finality after a hearing at either the local or state level.

Few cases have dealt with this issue. Those which have disapproved of state laws which interfere with the finality of administrative hearing decisions. In *Monahan v. State of Nebraska,* 491 F.Supp. 1074, 1093 (D.Neb.1980), *aff'd in part, vacated in part,* 645 F.2d 592 (8th Cir.1981), the court held that there were sufficiently serious questions as to the validity of a Nebraska statute to justify granting a preliminary injunction. There, the State statute gave the State Commissioner of Education the authority to modify a decision made by an impartial hearing officer regarding a program for a handicapped child. The State statute appeared to conflict with the federal requirement that the decision of the hearing officer be final. The issue was not decided, since a change in State law rendered it moot. *Rose v. Nebraska,* 530 F.Supp. 295, 298 (1981), *aff'd in relevant part,* 687 F.2d 1164 (8th Cir.1982), *cert.*

*denied,* 460 U.S. 1012, 103 S.Ct. 1252, 75 L.Ed.2d 481 (1983), *modified after remand,* 748 F.2d 1258 (1984), *cert. denied,* —— U.S. ——, 106 S.Ct. 61, 88 L.Ed.2d 50 (1986). (*See also Helms v. McDaniel,* 657 F.2d 800, 805–06 (5th Cir.1981), *cert. denied,* 455 U.S. 946, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982).

■ In light of all of the above, I find that the Commissioner lacked the authority, under federal law, to review the hearing officer's decision at least to the extent that the hearing officer 1) affirmed the COH's finding that Lara was handicapped under the EHA; and 2) accepted the COH's IEP as to services which are educational or related services (*see* 20 U.S.C. § 1401 (16–19)). The Commissioner did not, in his order, discuss the approval status of Hedges or its ability to meet Lara's needs, which may have been permissible under the EHA. Therefore, the Commissioner's decision will not be considered.[10]

Plaintiff now seeks either 1) full summary judgment and an order directing the defendant to implement the decision of the hearing officer; or 2) partial summary judgment as to the issues of Lara's status

---

**10.** In addition, the Commissioner's decision relied upon a New York State definition of "seriously emotionally disturbed." Under the New York definition, a child must have an inability to learn which cannot be explained by intellectual, sensory, or health factors (Appendix, p. 4). However, as is pointed out by plaintiff, the federal definition set out in 34 C.F.R. § 300.-5(b)(8) differs in a material respect: an inability to learn is *not* a necessary characteristic of a seriously emotionally disturbed child; it is only one of five possible symptoms:

(a) As used in this part, the term "handicapped children" means those children evaluated in accordance with §§ 300.530–300.534 as being mentally retarded, hard of hearing, deaf, speech impaired, visually handicapped, seriously emotionally disturbed, orthopedically impaired, other health impaired, deaf-blind, multi-handicapped, or as having specific learning disabilities, who because of those impairments need special education and related services.

(b) The terms used in this definition are defined as follows:

   *    *    *    *    *    *

(8) "Seriously emotionally disturbed" is defined as follows:

(i) The term means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree, which adversely affects educational performance:

(A) An inability to learn which cannot be explained by intellectual, sensory, or health factors;

(B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers;

(C) Inappropriate types of behavior or feelings under normal circumstances;

(D) A general pervasive mood of unhappiness or depression; or

(E) A tendency to develop physical symptoms or fears associated with personal or school problems.

(ii) The term includes children who are schizophrenic. The term does not include children who are socially maladjusted, unless it is determined that they are seriously emotionally disturbed.

Of course, the federal definition would control. It appears to the court, based upon the evidence and affidavits submitted by plaintiff, that Lara meets the federal definition.

as a handicapped individual and her need for residential placement. Under the second alternative, plaintiff urges that the trial would be limited to the issue of the approval status of Hedges.

For the same reasons that the Commissioner could not review certain aspects of the hearing officer's decision, neither will this court. Congress explicitly provided that parents, teachers, and local boards of education must develop a program to meet the needs of a handicapped child. By implication and practice, they also determine which children are educationally handicapped (*See generally* N.Y.Educ.Law § 4402(1)(a). When an impartial hearing officer reviews these determinations, Congress has determined that the hearing decision will be final unless appealed by an aggrieved party. 20 U.S.C. § 1415(e)(1). Here, plaintiff was not aggrieved by the hearing officer's decision.

There is one vital distinction to be made, however. The local committee has the authority to design an IEP for the child. The IEP is a comprehensive statement of the educational needs of a handicapped child and the specifically designed instructional program and related serves designed to meet those needs. *Burlington School Committee v. Dept. of Education,* —— U.S. ——, 105 S.Ct. 1996, 2002, 85 L.Ed.2d 385 (1985). The definition provided in the Act itself clearly focuses upon educational services to be provided to the child:

The term "individualized education program" means a written statement for each handicapped child developed in any meeting by a representative of the local educational agency or an intermediate educational unit who shall be qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of handicapped children, the teacher, the parents or guardian of such child, and, whenever appropriate, such child, which statement shall include (A) a statement of the present levels of educational performance of such child, (B) a statement of annual goals, including short-term instructional objectives,

(C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) the projected date for initiation and anticipated duration of such services, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

20 U.S.C. § 1401(19).

Related services are also covered by the Act. A "related service" is a service which is required to assist a handicapped child to benefit from special education:

The term "related services" means transportation, and such developmental, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, and medical and counseling services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a handicapped child to benefit from special education, and includes the early identification and assessment of handicapping conditions in children.

20 U.S.C. § 1401(17).

Both special education and related services are part of a "free appropriate public education" which will be provided at the public expense. 20 U.S.C. § 1401(18). Other services, however, such as certain medical services are not covered by the Act, and there is no obligation that they be publicly funded. 20 U.S.C. § 1401(17). *Irving v. Tatro,* 468 U.S. 883, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984).

■ One of the pivotal issues in this case is to what extent, if any, the State of New York must provide certain services for Lara. To do as plaintiff suggests and fully accept the IEP designed by the COH would serve only to bypass this crucial issue. Defendant cannot be required, even by a final decision of a hearing officer, to pay for services which are not covered by the Act. For instance, whether residential place-

ment, as recommended by the IEP, is in response to educational needs or to medical, emotional, or social needs must be determined. *McKenzie v. Smith,* 771 F.2d 1527, 1534 (D.C.Cir.1985).

■ To the extent that the IEP developed by the parents and approved by the hearing officer provides for educational or related services as defined by the Act and in case law, it will be accepted by the court. However, at this point, it appears to the court that Lara has both medical and educational needs. Any decision as to defendant's financial responsibility can only be made after a trial on the merits. Both parties should be prepared to present evidence as to the *nature* of the services Lara Needs and those she is receiving.[11]

■ Additionally, the New York State Education Department is responsible, under both state and federal laws discussed above, for approving out-of-state and/or private institutions. As the hearing officer

herself noted, it is generally beyond the authority of a hearing officer to order placement in an institution such as Hedges. Since there is a dispute between the plaintiff and the Commissioner as to this point, issues at trial will also include the approval status of Hedges, its suitability to meet Lara's needs, and the possibility of any alternative placement. The parties must present evidence as to all these points.

Plaintiff is granted partial summary judgment. The Commissioner's decision will not be considered by the court. The decisions of the COH and the hearing officer will be considered final as to whether Lara is handicapped under the Act and as to certain portions, with the limitations discussed above, of her IEP. The court will meet with counsel on July 18, 1986, at 9:30 a.m. to set a trial date and to take up any other matters which need to be addressed.

So ordered.

---

11. The court also notes that Lara's IEP (Item 3, Exh. D) is somewhat general in its terms. The hearing officer did not discuss much of the detail in the IEP, but focused on the need for residential placement. She did, however, implicitly approve the IEP (Appendix 1, p. 1576). If relief is warranted, evidence will be needed as to the specifics of her program for the fashioning of an appropriate remedy.

## APPENDIX 1

Date of Hearing:  December 9, 1985        Date of Decision: December 26, 1985

*Born Feb 73*

Student's Name: Lara Antkowiak        Date of Birth:    Feb. 11, 1973
                50 Saybrook Place
                Buffalo, NY 14209     Chronological Age: 12 years 10 mths.

Current Designation of Handicapping Condition:
     Emotionally disturbed

Current Placement: Devereaux Foundation, Hedges Treatment Center

Petitioner: Bruce Goldstein, atty.     Respondent: Jerome Schad, atty
            Dr. & Mrs. John Antkowiak              Buffalo City School
            1200 Liberty Bank Bldg.                   District
            Buffalo, NY   14202                   1800 One M&T Plaza
                                                  Buffalo, NY 14203

Issue/Purpose of Hearing:    Federal Judge John Curtin ordered

the hearing in order to review the placement of the child.

Recommendations of Committee on the Handicapped:   Classify as

emotionally disturbed with residential placement.

Decision:  Classify as emotionally disturbed with residential

placement at the Devereaux Foundation, Hedges Treatment Center

Hearing Officer:    Rivona Ehrenreich        *Arbitrator*
                    74 Mt. Vernon Road
                    Snyder, NY   14226       *al an*

Antkowiak v. Ambach

Civ. No. 85-532C

### Hearing Officer's Finding of Fact and Decision

Appearances:

For the Parents: Dr. John Antkowiak, Father, Judith Antkowiak, Mother, Bruce Goldstein, Attorney, Mary Lang, Legal Assistance Program, Frank Alabeso, Ph.D., psychologist.

For the Buffalo City School District: Jerome D. Schad, Attorney, Rosalie Wiggle, District Committee on the Handicapped, Coordinator, Lew Conte, School Psychologist.

Hearing Officer: Rivona Ehrenreich.

### Parents Position

The parents agree with the classification of emotionally disturbed. They maintain that Lara cannot be educated within a mainstream classroom or within any special education classroom in a non-residential setting.

The parents insist that the only educational environment in which their child can benefit is within a 24 hour residential educational program.

### TESTIMONY ENTERED INTO EVIDENCE

### District's Position

Buffalo City School District contends that the Committee on the Handicapped recommendation of emotionally disturbed classification is appropriate. Additionally, the Board recommends residential placement at the Hedges Treatment Center of the Devereaux Foundation in Devon, Pennsylvania.

The District asserts that the primary issue in contention is implementation of the educational placement of Lara.

### TESTIMONY ENTERED INTO EVIDENCE

### Stipulation

At the outset of the hearing, there were a series of stipulations. They are:

1. The Parents and District agree on the classification of emotionally disturbed.

2. There is no dispute that the recommendation of residential placement at Devereaux Foundation, Hedges Treatment Center is correct.

3. The parties waive the procedural "5 day exchange of evidence rule."

4. As a result of pending litigation in U.S. District Court Western District of New York, Lara Antkowiak, by her parent and natural guardian, John M. Antkowiak v. Gordon M. Ambach, as Commissioner of the New York State Education Department, an order by Judge John T. Curtin, resulted in the instant due process hearing.

5. Neither Parents, the District nor the New York State Education Department objected to Judge John T. Curtin's order and direction for an expedited hearing on November 4, 1985.

It must be noted that at the present hearing the Parents raised a continuing objection to the instant due process hearing, claiming that a due process hearing would be unnecessary but for the order of Judge John T. Curtin.

### Finding of Fact

Lara was born February 11, 1973. Lara's natural mother had a normal pregnancy and delivery. Lara's mother died when Lara was 4 years old. Lara's father, Dr. John Antkowiak remarried when Lara was 5½ years old, just prior to Lara's attendance at kindergarten.

In the fall of 1978, Lara attended kindergarten at Mt. St. Joseph's Academy. She attended grade 1 at the same school.

Lara attended the Elmwood Franklin School for grades 2 through 4. In the spring of 1983, Lara's emotional problem was noted. This was manifested in her school work. She became perfectionistic, isolative, and socially withdrawn. In the summer of 1983, Lara's pediatric examination revealed a lack of weight gain. It was apparent that there were problems with Lara's inability to eat and with her self image. In September of 1983, Lara was not functioning well. Her inability to eat continued and she was diagnosed as having anorexia nervosa.

In October of 1983, while Lara was still enrolled at the Elmwood Franklin School, she was hospitalized at the Strong Memorial Hospital in Rochester, New York. Packets of educational material from Elmwood Franklin were sent to the hospital to keep Lara current with her school work. Lara had a difficult time coping with the school work. At Christmas time, Lara came home from the hospital.

In February 1984, Lara re-entered Strong Memorial Hospital where she remained until late March 1984, when her weight stabilized. She returned to the hos-

pital in June 1984 and remained there until May 16, 1985.

In August 1984, Lara's father searched for residential treatment facilities throughout the country. No facility would accept Lara.

From March 1984 until January 1985 Lara was officially enrolled at Nardin Academy although she never physically attended classes. In January, Lara was officially dropped by Nardin Academy. Her last grade completed was the 4th.

Since May 1985, there has been no public funding for Lara's educational placement.

On February 17, 1985, the Buffalo City School District's Committee on the Handicapped recommended that Lara be classified emotionally disturbed and placed in a residential facility. The Committee on the Handicapped then began the process of implementing the individual educational plan. The process of residential placement involves applying to five (5) in-state facilities from New York State's list of approved private schools. Furthermore, the schools contacted must be appropriate to the academic, social, physical and management needs of the child. The list used was dated October 1983.

The Committee on the Handicapped Coordinator, Rosalie Wiggle, applied to six (6) in-state approved schools. Lara was rejected by all. Ms. Wiggle testified that there was no appropriate in-state placement to which Lara was accepted.

On March 21, 1985 the Committee on the Handicapped submitted an application for approval to the Commissioner of Education for placement at Hedges Treatment Center of the Devereaux Foundation in Devon, PA, as listed on the approved list. The Committee on the Handicapped determined that the Hedges Treatment Center was the only identified residential educational program to meet Lara's needs. This facility had been used before by the State Education Department for out of state placement.

In mid-April 1985, the State Education Department refused Lara's placement at Hedges because there was a "hold on new admissions of New York students to Hedges." The State Education Department requested the Committee on the Handicapped to contact three additional residential placements within New York State. The Committee on the Handicapped complied, contacting the Rhineheck County School, Anderson School, and Convelescent Hospital. The three schools also rejected Lara.

In May 1985, the current State Education Department approved list was published. It listed Devereaux Foundation's Hedges Treatment Center separately and closed the program to new admissions. However, New York state students who had been admitted prior to May, 1985 were permitted to remain throughout the 1986 year if alternative educational placements could not be secured.

At this time Lara was not placed at any public or private facility. The hospital insisted that it could not care for Lara any further. Thus, on May 16, 1985, John Antkowiak unilaterally placed Lara at the Hedges Treatment Center.

In May, the Parents decided they had no alternative but to file suit in Federal court for relief. Judge John T. Curtin decided that the Parents had not exhausted their administrative remedies and ordered them to do so on November 4, 1985.

### 1. Placement

Lew Conte psychologist for 14 years and chairman of the Psychology Department, Buffalo Public School District testified. He attended a case conference in Rochester with the Strong Memorial team on February 22, 1985, and visited a residential program at the Hillside Residential Treatment Facility on May 7, 1985.

Findings of Mr. Conte's testimony include:

(a) On the Weschler Intelligence Scale—Revised, Lara obtained a performance IQ of 143. She is clearly of superior intellectual ability. Her academic achievement is more than 2 years above her grade level on

standardized testing, although she is unable to succeed in a regular classroom.

(b) On the Wide Range Achievement Test she achieved a reading level of 9.3, math level of 8.9, and spelling level of 7.9.

(c) Projective testing showed that Lara was intelligent and vulnerable. Also, it revealed that she had poor reality testing and a poor sense of herself, a low self-esteem.

(d) In her social development, she has been unable to relate appropriately to peers. She needs to develop a distinction between fantasy and reality. She has a schizophrenic component in addition to her other problems. She needs to improve appropriate social interaction skills with her peers.

(e) Lara's management needs include a one-to-one or small group program. She needs to develop a working relationship with her teachers.

(f) Furthermore, she needs a non-competitive environment.

(g) Psychiatric problems are now seen as far more severe than first described. In addition to anorexia nervosa, Lara now presents schizophrenic characteristics including delusions of grandeur and omnipotence, poor reality testing and confabulatory thinking. She is aware of her disordered thought processes and is extremely concerned about losing her sanity. Additionally she is pre-occupied with thoughts of suicide and is considered "at risk" in this regard. These characteristics are all-consuming and intrude into all facets of her daily life, including educational pursuits.

(h) Lara is obsessed with perfection. For example, getting a 98% on an assignment leads to extreme temper tantrums over the 2% that she missed. A grade of 100% is casually dismissed as totally unimportant. Ordinary praise and punishment to shape behavior is ineffective since the former is denied (feelings of no self-worth) and the latter is deserved ("beat-me, punish me").

(i) She is in need of 24 hour supervision, out of the home environment, in a fully structured and supervised setting in order to monitor for suicidal behavior and calorie-intake (to insure maintenance of normal weight).

In conclusion, Lew Conte maintains that Lara could not function in a regular education program. Devereaux is regarded as the most appropriate and most successful placement for Lara. All aspects of Lara's IEP are met at Devereaux. Moreover, he demonstrated that two students, Nancy M. and Karen K. have established precedents for the desirability and appropriateness of Devereaux. They have overcome their emotionally disturbed handicapping conditions at Devereaux to become successfully educated, participating students.

Frank Alabeso, Ph.D. psychologist for 15 years, has had a unique opportunity to extensively observe and evaluate Lara. His first contact with the Antkowiak family was in 1983 when he saw her within the context of family visitations with her maternal grandparents. The cause of her emotional problems originated while her natural mother was dying.

He again saw and evaluated Lara in April 1985 at Strong Memorial Hospital and in October 1985 at Hedges. Dr. Alabeso compared the two 1985 interviews with the 1983 meetings. Among his findings, Dr. Alabeso observes that in April 1985, Lara was extremely depressed, emotionally rigid, highly anxious and extraordinarily preoccupied. He was concerned with her reality testing. Dr. Alabeso asserts that the contrast from 1983 was remarkable and that the clinical indicators reached drastic proportions by April 1985. In October 1985, while at Devereaux, Dr. Alabeso saw an encouraging improvement. Lara was less depressed and there was more social interaction in contrast to her extremely withdrawn state of April 1985. Dr. Alabeso noted that in October, Lara was moving toward a "best friendship" with one other child. Lara was beginning to realize both emotional and health problems. Her general progress was improving.

When read the legal definition of emotionally disturbed, Dr. Alabeso acknowledges that Lara exhibits all characteristics of the four legal categories of emotionally disturbed. She is both disfunctional and non-functional, especially with respect to symptoms of anorexia nervosa. Her peer relationships have broken down. Her extreme depression affords her greater suicidal tendencies.

Dr. Alabeso firmly insists that because Lara is so preoccupied with the causes of her emotional conflicts, that she is impaired. Lara swings from becoming emotionally withdrawn to exhibiting obsessive perfectionistic behavior. Her anxiety level is beyond her ability to manage her emotions. Despite her intellectually gifted capabilities, Lara's emotional instability prevents her educational advancement.

Since Dr. Alabeso's visitation to Hedges, he recommends residential placement for Lara at Hedges Treatment Center. In fact, Dr. Alabeso concludes that it would be a serious regression for Lara if she were removed from Devereaux particularly since she has made progress. Dr. Alabeso emphasizes that placement at Devereaux is necessary because Lara's condition is life threatening.

**CONCLUSION**

The definition of emotionally disturbed, as cited from 8 NYCRR Part 200.1(cc)(2) is:

Emotionally disturbed. A pupil with an inability to learn which cannot be explained by intellectual, sensory or health factors and who exhibits one or more of the following characteristics over a long period of time and to a marked degree:

(i) an inability to build or maintain satisfactory interpersonal relationships with peers and teachers;

(ii) inappropriate types of behavior or feelings under normal circumstances;

(iii) a generally pervasive mood of unhappiness or depression; or

(iv) a tendency to develop physical symptoms or fears associated with personal or school problems.

The term does not include socially maladjusted pupils unless it is determined that they are emotionally disturbed.

Evidence clearly shows Lara exhibits *all* characteristics of the four categories, only one of which is necessary for the legal definition to apply. .

Lara's primary handicapping condition is emotionally disturbed. Her emotional disturbance adversely affects her educational performance. All witnesses agree that this is clearly an intellectually gifted child. Her IQ of 143 was tested in December 1984 while she was diagnosed as having anorexia nervosa and in an unstable emotional condition. Her last completed grade was 4. Packets of educational material from schools and interfacing with her special education tutor at Strong Memorial Hospital were non-productive.

Her physical condition, anorexia nervosa, is the result of her underlying emotionally disturbed condition. The child's physical condition becomes life threatening because of her extraordinary disinterest in nourishment and her suicidal tendencies.

The essence of the issue revolves around effectuating a suitable educational placement for Lara. There is no dispute between the Board of Education and the parents regarding placement at Hedges. The dispute centers on the freeze the State Education Department has placed on Hedges regarding Lara. The substantive issue of placement turns on two complicated points: (1) Lara's needs and (2) the State Education Department approved list of out-of-state schools.

The overwhelming consistency of testimony verifies that Lara's gifted intellectual capacity, in combination with her anorexia nervosa makes coping with her needs extremely difficult. Nine in-state schools have rejected her applications. Contacts made by her family to other facilities throughout the country resulted in similar rejections. None but Devereaux would accept her.

The unanimous opinion, on the record, proves that Devereaux is the appropriate placement for her educational needs.

The corroborating testimony shows that Lara has stabilized while at Devereaux and indeed is making "encouraging improvement", as stated by Dr. Alabeso.

More importantly, all testimony reveals that there is no in-state facility willing or able to provide Lara with the special educational support she needs.

I am aware that the legal mandate requires that a child be educated in the least restrictive environment appropriate to her educational needs. Lara has stabilized in the past few months. Her life threatening situation has been reduced.

The Commissioner of Education decision and federal law clearly indicate that an educational setting which impedes rather than enhances the educational progress of a child is against the legislative intent of the Federal Education for the Handicapped Act.

The issue regarding Lara's placement at Hedges has gone unexplained to my satisfaction. The State Education Department is permitting other New York State handicapped students who are currently residents at Hedges to remain there through the remainder of the 1984–85 school year and for the 1985–86 school year if alternative educational placements cannot be secured. The continuance of current placements was approved despite the fact that on May 9, 1985, Hedges was informed that it was removed from the list of approved schools.

When the Committee on the Handicapped recommended the Hedges program at Devereaux in March 1985, it was on an approved list. Ms. Wiggle testified that the October 1983 list had not been changed; Devereaux was approved. It was common practice to use the last published approved list which was the 1983 list. Ms. Wiggle was not informed of any change excluding Hedges. The current approved list was published by the State Education Department in May 1985, two months after Lara's rejection by nine in-state schools.

Furthermore, State Education Department did not seek participation from Lara's parents in discussions concerning their child. It is the intent of the law to have parental participation as much as possible when determining a child's educational needs.

In conclusion, the record indicates that if Lara is not placed in an appropriate educational residential program, it has been prognosticated that she will encounter a life threatening situation. Lara cannot attend a customary school without seriously affecting her health. Her emotional problems are interfering with her educational advancement and with her health.

The Committee on the Handicapped fulfilled its obligation and responsibility to the maximum degree under state law. The State Education Department has failed to implement the correct and appropriate placement of Lara.

Ordinarily, a hearing officer does not have authority to order placement of a child at a residential educational program that is not currently on State Education Department's list of approved residential educational placements. However, where no placement can be identified from the approved list that can appropriately meet a child's educational needs, as in the instant compelling case, it is both necessary and proper for the hearing officer to order the placement of a child at a school not currently on the approved list, if that is what is needed to ensure the child a free appropriate public education. Therefore, I find that Lara needs immediate educational placement at Hedges, in accordance with her emotionally disturbed classification, at no expense to her or her parents.

## BUFFALO PUBLIC SCHOOLS

STATE OF NEW YORK: COUNTY OF ERIE

In the Matter of An Administrative Hearing of Dr. & Mrs. John Antkowiak, on behalf of their daughter, Lara, from the order of Federal District Judge John T. Curtin

### DECISION

Based on the evidence presented at the hearing, I find that Lara is deserving of a classification of emotionally disturbed.

In the matter of placement, the need of a residential educational program for Lara is supported by the overwhelming amount of evidence presented on the record. The Committee on the Handicapped recommendation is appropriate. The clear and convincing evidence validates the fact that Lara's severe emotional problems clearly prevent her from making educational progress. Her unique educational requirements demand individualized or small group instruction as well as psychotherapy. The program at Devereaux Foundation, Hedges Treatment Center is both appropriate and necessary.

Ordinarily, a hearing officer does not have authority to order the placement of a child at a residential educational program that is not currently on the State Education Department's list of approved residential placements. However, where no placement can be identified, from the approved list, that can appropriately meet a child's educational needs, as in the instant compelling case, it is both necessary and proper for the hearing officer to order the placement of a child at a school not currently on the approved list if that is what is needed to ensure the child a free appropriate public education and where the school in question currently serves New York State children.

**THE APPEAL OF THE PETITIONER IS UPHELD.**

**IT IS THEREFORE ORDERED:**

(1) That Lara be classified as emotionally disturbed.

(2) That Lara be immediately placed at the Devereaux Foundation, Hedges Treatment Center at no expense to her or her parents.

**PLEASE TAKE NOTICE**

Within 30 days of the receipt of this decision, the parent and/or Board of Education has a right to obtain a review by the Commissioner of Education under Section 4404 of the Education Law and Public Law 94–142 by filing a petition of appeal to the Commissioner. Failure to file the petition in a timely fashion will result in a waiver of the right to appeal this decision.

This decision rendered December 26, 1985.

Rivona Ehrenreich
Impartial Hearing Officer

APPENDIX 2

No. 11608

The State Education Department

Before the Commissioner

Review of a determination of a hearing officer relating to the classification of an allegedly handicapped child by the Board of Education of the City School District of the City of Buffalo, and her proposed placement in a special education program.

Hodgson, Russ, Andrews, Woods & Goodyear, Esqs., attorneys for respondent Board of Education, Jerome D. Schad, Esq., of counsel

James R. Sheldon, Jr., Esq., attorney for co-respondents.

By an order dated February 11, 1986, I directed the board of education of the City School District of the City of Buffalo and the parents of a student suspected of having a handicapping condition to show cause why a decision by an impartial hearing officer finding that the student should be classified as emotionally handicapped and should be placed at the Hedges Treatment Center in Pennsylvania should not be annulled. The board of education was also directed to submit the record before the hearing officer, copies of all minutes of its committee on the handicapped in relation to the classification and placement of the student and other pertinent information. The student's parents and the board were also directed to describe how the child's present educational placement meets the applicable requirements of Part 200 of the Regulations of the Commissioner of Education.

Upon review of the record before me, I am compelled to find that the record does not support the determination that the student in question has an educational handicap, nor does it contain any information

about the educational program as proposed or now being furnished to co-respondent's daughter and hence does not support the determination that either program meets her alleged educational needs.

Co-respondent's thirteen year old daughter was in the fifth grade at a private school in Buffalo during the 1983–84 school year. However, she attended classes for only a few weeks, and was hospitalized from October to December, February to April, and during May, because of an eating disorder. Medical reports describing her condition at the time of admission to Strong Memorial Hospital indicate that she was admitted to stabilize her weight and general health, based upon a diagnosis of anorexia nervosa. Although school assignments were sent to her at the hospital, she reportedly did not complete the assignments, but was nevertheless awarded passing grades for that school year by the private school. She was enrolled in a different private school because her parents believed she would be better able to cope with less academic pressure at such school. The student did not attend classes at the second school, nor did she complete the assignments provided for her at the hospital, where tutoring services were available. Late in 1984, the parents were informed that the hospital intended to discharge their daughter early in 1985, and recommended placement at a therapeutic residential treatment center.

The parents first contacted the Buffalo school district's committee on the handicapped (COH) in November, 1984 to request that their daughter be evaluated for special education. They indicated at that time that the therapy group at Strong Memorial Hospital where their daughter was hospitalized had recommended that she be placed at the Hedges Treatment Center. It is my understanding that the Hedges Treatment Center was an accredited psychiatric hospital at that time, and was not approved as a school by the State of Pennsylvania. As part of their application, co-respondents provided extensive evaluation reports from the hospital, and in January, 1985 the COH met with co-respondents to

consider the question of their daughter's eligibility for special education.

The minutes of the January 1985 COH meeting indicate that the school physician stated his opinion that the records which had been furnished to the COH by the parents do not support the conclusion that the student has an educational problem, but relate instead to a psychological and medical problem and a psychiatric disturbance. The school psychologist also concluded that there was nothing in the records to indicate that the student would need any special education services in order to benefit from her educational program. The COH then voted unanimously not to classify co-respondent's daughter as educationally handicapped.

At a February 27, 1985 meeting of the COH, the parents submitted a letter from a psychiatrist which was critical of the ability of a public school system to meet the therapeutic needs of an anorexic student, and suggesting that the Devereaux Foundation, of which the Hedges Treatment Center is a unit, could meet those needs. The COH also considered a psychiatric evaluation of the student completed by a psychiatrist affiliated with the Devereux Foundation.

That evaluation described the student as having an intact memory and appropriate thought content, and hypothesized that she used her high intelligence to disguise her psychological pathology. The psychiatrist diagnosed the student's condition as anorexia nervosa, undifferentiated schizophrenia, schizotypal personality, complications of self-starvation, and history of reported emotional and physical abuse. The diagnosis also indicated that the girl's highest level of adaptive functioning over the prior year was at Level 4 or fair, meaning moderate impairment in any of the social relations or occupational functions or some impairment in both, and recommended that the girl be accepted at the Hedges Treatment Center, that she be monitored for need of psychotropic medication, and be provided with full-unit programming and probable placement for classes in an un-

specified day school. The minutes of the COH meeting also indicate that two committee members saw co-respondent's daughter at Strong Memorial Hospital, and met with staff of the hospital.

Although the minutes of the February meeting focus on the development of a Phase I individualized education program (IEP) for the student as a girl classified as emotionally disturbed, the minutes do not set forth the educational considerations which prompted the COH to identify the child as a person in need of a special education program, after strongly rejecting that conclusion at its previous meeting.

The IEP which the COH approved at its February meeting recommends a residential placement for co-respondent's daughter, with a classroom student/teacher ratio of 12:1 and one aide. The IEP describes the student's academic skills as more than two years above her grade level, and states that she has a need for noncompetitive small group instruction. With respect to social development, the IEP reports a need for her to learn to distinguish between fantasy and reality, and a need for treatment of her schizophrenic problems. That portion of the IEP which dealt with physical needs focused on her anorexia and need to receive medication. Her management needs called for small group programming with 24 hour supervision. The IEP also provides that individual and group counseling each be provided once a week for 30 minutes, and that nutritional counseling and recreational therapy be provided once a week for 30 minutes.

The COH recommended placement of the student at the Hedges Treatment Center of the Devereux Foundation, but there is no discussion of the educational program which the COH understood would be furnished at that facility and no indication of how the goals identified in the Phase I IEP would be met by the placement. Indeed, there is no indication in the record of the COH meeting to indicate that the committee members had any information about the "probable" day school placement or about the Hedges Treatment Center, other than the fact that it had been recommended by staff members at Strong Memorial Hospital. The COH specified a review date of January, 1986, but the board of education has given no indication that its COH conducted such a review, and at this point the required annual review is overdue.

After making its determination, the Buffalo school authorities contacted the regional office of this Department's Office for Education of Children with Handicapping Conditions for approval of the out-of-State residential placement. The regional office did not approve the placement recommendation, and the student's parents then initiated an action in the United States District Court for the Western District of New York, which is still pending. In the course of that litigation, the Court indicated that the parents were required by law to exhaust their administrative remedies by requesting an impartial hearing.

The parents then requested a hearing, and that hearing was conducted in two sessions, one on December 6, 1985 at which a number of exhibits were marked for identification, and the second on December 9, 1985, at which the attorneys representing the parties stipulated that the recommendation for classification and the recommendation for placement at the Hedges Treatment Center were appropriate. The attorneys also agreed that the exhibits marked at the first session need not be included in the record before the hearing officer. Most of the testimony during the hearing concerned the school district's attempts to arrange a placement for co-respondent's daughter, and to obtain approval by the State Education Department.

On December 26, 1985, the hearing office issued a decision which recited that the parents and the school district had stipulated to the correctness of both the classification and the placement at the Hedges Treatment Center, and found that the student meets the criteria of section 200.-1(cc)(2) of the Regulations of the Commissioner of Education for classification as emotionally disturbed and would be properly placed at the Hedges Treatment Center.

In accordance with my order to show cause dated February 11, 1986, the board of education and the parents were afforded the opportunity to address the correctness of the hearing officer's decision with specific reference to the legal requirements for classifying and placing a handicapped child. However, neither party has addressed that issue. Both the parents and the board have challenged my jurisdiction to review the decision of the hearing officer. They assert that such review is inconsistent with the provisions of 20 USC 1415 because neither party is aggrieved by the hearing officer's decision or has appealed from such decision.

As was indicated in my order to show cause, the recent decision of the Supreme Court, Albany County, in *Matter of Sidney K. v. Ambach*, Hughes, J., January 21, 1986, n.o.r., held that the Commissioner of Education is obligated to review a hearing officer's decision with which he disagrees, even if such decision has not been appealed by the parents or board of education. It must also be noted that the United States District Court in the action brought by the student's parents has specifically directed the parents to exhaust their administrative remedies, which include State level review of a local hearing officer's decision. In its most recent decision, dated February 27, 1986, the District Court indicated that my review of the COH recommendation would be beneficial (see also, *Riley v. Ambach*, 668 F2d 635; *Rowley v. Ambach*, 632 F2d 945, rev. on other grounds 458 US 176). Although the board of education asserts that it is not aggrieved by the hearing officer's decision directing the board to place the student in an out-of-State facility, it clearly may not effect such a placement without my approval. A regional associate of the Office for the Education of Children with Handicapping Conditions has declined to approve the proposed placement. As a result, the board of education is in fact aggrieved by a decision with which it cannot lawfully comply. The board's contention that I am bound by the decision of the hearing officer in a proceeding to which the State Education Department was not a party is clearly without merit.

The board of education also contends that I am without authority to consider any documents outside the record of the hearing, and its attorney indicates that in this instance the record of the hearing consists solely of the transcript of that proceeding. For this reason, it has declined to submit all of its records which pertain to this child.

The board's contention is inconsistent with the provisions of 20 USS 1415(c), which provides that in a review by the State educational agency of a local hearing officer's decision, the officer conducting such review shall make an independent decision after completing that review, and the corresponding Federal regulation, 34 CFR 300.510, which requires that the official conducting the review shall seek additional evidence if necessary. In view of the patently inadequate record before the hearing officer, the additional evidence which I directed the board of education to furnish is clearly necessary in order for me to render a decision in this review of the hearing officer's decision.

Although neither party has submitted argument with respect to its reasons for contending that the hearing officer's decision is correct, I have reviewed the hearing transcript and find it totally inadequate to support either the classification of co-respondent's daughter as emotionally disturbed or the placement recommended by the hearing officer.

In order for a child to be properly classified as emotionally disturbed as that term is defined in section 200.1(cc)(2) of the Regulations of the Commissioner of Education, it is necessary that a pupil have "an inability to learn which cannot be explained by intellectual, sensory or health factors", and that the youngster exhibit one or more of four characteristics of emotional disturbance.

A psychological report concerning this student completed under the auspices of the University of Rochester in December 1984 included an intellectual evaluation which resulted in a verbal score of 143, a

performance score of 133 and a full-scale score of 143. The subtest distribution was unremarkable except for the consistent performance in the very superior range of ability. Her score on a short-term memory task was the only average performance. Her high intelligence was also apparent in projective testing and was used to mask difficulties in reality testing. Her compulsive behavior, preservation, feelings of inadequacy, and a tendency toward delusional thinking were also noted. This evaluation noted the girl's high intelligence, her manipulative use of her ability, and her difficulty in dealing with the environment.

The academic information provided to me also includes the summary scores of group testing completed in 1982, 1983 and 1984 by the private elementary school she attended before her hospitalization. Of the nine test scores in the areas of language arts and mathematics, her poorest performance occurring in 1982 when she was in the third grade, was at the 88th percentile based on national norms. Four of her scores were at the 99th percentile and three others were at the 97th and 98th percentiles. The test was readministered in 1985 between her second and third hospitalization, and her performance was at the 94th percentile in the subtest that had been at the 88th percentile in 1982. Six of her scores were at the 99th percentile. The two remaining scores were at the 97th and 95th percentiles. National norms are generated on the performance of all students at a grade level who took the test.

In December 1984, when she was 11 years, 10 months old, the youngster's scores on a Wide Range Achievement Test administered at Strong Memorial Hospital were at the 9.3 grade level in reading, the 7.9 grade level in spelling and the 8.9 grade level in mathematics. These skill levels are generally consistent with projected expectations based on the intelligence testing completed in December 1984. There was no classroom observation provided. The clear indication, based on this information, is that co-respondents' daughter does not display an inability to learn which cannot be explained by intellectual, sensory or health factors.

The academic achievement presented by the girl, and as noted in her IEP, does not require special education services, since it is above grade level expectancy. Although the hearing officer stated that the student's severe emotional problems clearly prevent her from making educational progress, all the educational reports indicate that she progressed academically with the minimal tutoring provided while she was hospitalized. This indicates that, contrary to the hearing officer's conclusion, the student's psychiatric problems have not created an inability to learn. It appears that the hearing officer saw the need to order a placement at the Hedges Treatment Center because no other facility has indicated that it would accept the child, notwithstanding that the girl's educational placement appears to be the Devereux Day School. It should be noted that in their application to the COH, the parents indicated that their daughter has no learning problems, and is an excellent student.

Because there is no evaluation or testimony indicating that the student demonstrates an inability to learn that cannot be explained by intellectual, sensory or health factors, but to the contrary, continues to be progressing based on standard test scores provided for my review, and because all indications are that she is working academically at a level appropriate for a child of her ability, I must annul the hearing officer's decision.

Although there is no observation report of the child in an educational setting to aid in determining her need for special education, there is extensive evaluation which has been discussed and attributes the girl's problems to her psychiatric condition which is basically a medical disorder. An inability to learn due to a health factor is specifically excluded from the definition of emotionally disturbed for purposes of an educationally handicapping condition (8 NYCRR 200.1[cc][2] ).

The evaluation reports presented strongly support the girl's need for psychiatric

and medical support services in a residential treatment program, and the physicians involved have indicated problems and needs beyond the scope of educational services. However, provision of a placement for psychiatric and medical treatment for an individual of school age is not a school district responsibility, and the Congress specifically excluded medical treatment from the responsibilities of a school district (20 USC, 1401[a][17] ). In this instance, the student's medical condition is clearly distinguishable from her educational needs (*MacKenzie v. Smith*, 771 F.2d 1527; *Ahern v. Keene*, 593 F.Supp. 902; *Matthews v. Davis*, 742 F.2d 825). When a child is hospitalized for medical reasons, the school district's obligation is limited to the furnishing of educational services during hospitalization or confinement to home (see Education Law section 3202, subdivision 7). It is my understanding that the regional office of the Office for the Education of Children with Handicapped Conditions so advised the Buffalo public school authorities in the summer of 1985 upon learning of the parents' placement of their daughter at Hedges, but I find no indication that the school district took any steps to provide those educational services.

In view of my finding with regard to the absence of an educationally handicapping condition, as well as the absence of any meaningful description of the proposed educational program the student would receive while placed at the Hedges Treatment Center, it necessarily follows that the hearing officer's finding that the student should be placed at the Center must also be annulled.

THE DECISION OF THE HEARING OFFICER IS ANNULLED, and

IT IS ORDERED that the Board of Education of the City School District of the City of Buffalo reconvene its committee on the handicapped for action in accordance with this decision.