**Lara ANTKOWIAK, by her parent and natural guardian, John ANTKOWIAK, Plaintiff,**

v.

**Gordon M. AMBACH, as Commissioner of the New York Education Department, Defendant.**

No. CIV–85–532C

United States District Court, W.D. New York.

Feb. 18, 1987.

Bouvier, O'Connor, Cegielski & Levine, Neighborhood Legal Services, State University of New York at Buffalo, Legal Assistance Program (Bruce A. Goldstein, James R. Sheldon, and Ronald M. Hager, of counsel), for plaintiff.

Robert Abrams, Atty. Gen. of the State of N.Y. (Peter B. Sullivan, Asst. New York State Atty. Gen., of counsel), Buffalo, N.Y., for defendant.

CURTIN, Chief Judge.

Plaintiff Lara Antkowiak is a 14-year-old girl with profound emotional disturbance and a severe eating disorder, anorexia nervosa. Lara's illness first surfaced when she was only ten years old, and since that time, she has been hospitalized on several occasions, once for nearly one year. The issue in this case is whether the New York State Education Department [SED] must pay for Lara's placement at a private residential and educational facility in Pennsylvania.

Plaintiff John Antkowiak, on behalf of his daughter, seeks relief under the Education for the Handicapped Act [EHA], 20 U.S.C. § 1401, *et seq.;* the Rehabilitation Act, 29 U.S.C. § 794; and the Fourteenth Amendment of the United States Constitution by way of 42 U.S.C. § 1983. A non-jury trial was held in October of 1986, and summations were heard on December 19, 1986. For the reasons below, I find that plaintiff is entitled, pursuant to the EHA,

to have his daughter placed at the Hedges Treatment Center at defendant's expense.

Many of the matters discussed in this decision have been fully addressed in prior decisions. *See* Orders of November 5, 1985 (Item 31), 621 F.Supp. 975; February 3, 1986 (Item 45); February 27, 1986 (Item 52); and July 11, 1986 (Item 63), 638 F.Supp. 1564.

In May of 1976, when Lara was three years old, her mother, Kathleen, became seriously ill with a connective tissue disorder. She became increasingly disabled and was unable to care for Lara. Kathleen Antkowiak died in June of 1977. Lara's father, John Antkowiak, M.D., remarried in 1978. At trial, he testified that Lara's adjustment to her mother's death was apparently quite good. She did not show any indication of emotional difficulties, and was progressing very well, both academically and socially. In fact, Lara has been described by teachers and psychologists as a very intelligent child, and has scored well on intelligence tests.

In the spring of 1983, however, when Lara was 10 years old, she became anxious and upset about her schoolwork. Dr. Antkowiak testified that at that time, Lara became increasingly withdrawn from her family and friends and began spending all her play time doing homework. He testified that Lara would review her assignments five or six times. In June of 1983, Lara's doctor noticed that she had not gained any weight since her last physical examination in the summer of 1982. Despite encouragement from her family, Lara would not eat and began to exercise compulsively. From October through December of 1983, Lara was hospitalized at Strong Memorial Hospital in Rochester, New York. During that time, the elementary school Lara attended sent packets of school work to the hospital; Lara completed only some of these.

Dr. Antkowiak testified that Lara returned to school for a short time in January of 1984, but went downhill and was readmitted to the hospital in February. She remained there until late March or early April. Her attention to her schoolwork declined during this second hospitalization.

In the early summer of 1984, Lara was hospitalized for a third time. She was admitted to the psychiatric unit at Strong Memorial. Throughout the fall of 1984, Lara derived no benefit from any educational program. According to Dr. Antkowiak, she deteriorated even further in the psychiatric unit and was transferred to a medical ward at Strong Memorial, where she remained until May 15, 1985.

From January through May of 1985, Lara was tutored by Ann Quivey, a special education teacher at Strong Memorial Hospital. Lara worked with Ms. Quivey on a one-to-one basis in a small classroom in the hospital. Ms. Quivey testified that Lara was initially cooperative and responsive to questions. They would usually meet for one hour each day. As time went by, however, Lara regressed. Ms. Quivey testified that as of mid-April, Lara regularly refused to come to class. Ms. Quivey would find Lara curled into a fetal position in her bed with the lights out. When Ms. Quivey did manage to persuade Lara to come to class, she would stare out the window and not respond to questions, occasionally becoming hostile.

Frank Alabiso, a licensed psychologist who has worked with children and their families for 17 years, examined Lara at the Antkowiaks' request in April of 1985. He testified that Lara was emotionally guarded, socially withdrawn, and extremely obsessive:

All in all, I found her to be one of the most disturbed children I had seen in my practice.... I thought she was completely incapacitated in terms of benefiting in any standard educational program.... She really needed an educational program in a residential milieu.... It needed to be a program that would incorporate both the child's educational needs and all the emotional, psychological, social and residential services in order to allow her to be able, or any

child to be able, to function educationally.

Item 68, Vol. 2, pp. 8–9.

Dr. Antkowiak testified that throughout Lara's last hospitalization at Strong Memorial, he was advised to look for a program which could tend to Lara's emotional, educational, and social needs, in addition to her physical problems. He spoke with various facilities throughout the country during the late summer and fall of 1984; none would accept Lara. At that time, Dr. Antkowiak also contacted the Devereaux Foundation in Eastern Pennsylvania and sent the admissions officer information about Lara. In December of 1984, Dr. Antkowiak contacted the Buffalo School District at the suggestion of the staff at Strong Memorial.

■ Pursuant to the federal Education for the Handicapped Act [EHA], 20 U.S.C. § 1401, *et seq.*, a state, such as New York, which receives financial assistance from the federal government pursuant to the Act must comply with certain requirements. The state must develop a plan to ensure that all children in need of special education and related services are identified, evaluated, and given a "free appropriate public education." To receive a "free appropriate public education," a handicapped child must have access to a program which is sufficient to confer some educational benefit to the child. *Hendrick Hudson Board of Education v. Rowley*, 458 U.S. 176, 200, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).

Under the EHA, it is the responsibility of the local educational agency to determine whether a child is handicapped and, if so, to develop a special program (Individualized Educational Program or IEP)[1] to meet that child's needs. 20 U.S.C. § 1401(a)(19), 1412(4), and 1414(a)(5). New York State has chosen to place the responsibility for determining whether a child is handicapped and designing an IEP with the Committee on the Handicapped [COH] of each local school district in the State. NY Educ.Law § 4402.1; *Riley v. Ambach*, 668 F.2d 635, 637 (2d Cir.1981). (*See* Decision and Order of February 3, 1986 (Item 45).)

The Buffalo School District's Committee on the Handicapped met on January 16, 1985, and determined, based on the limited information before it, that Lara was not handicapped so as to need special education. After the meeting in January, the COH obtained more information on Lara's condition.

Dr. Lew Conti, a school psychologist and member of the Buffalo COH, testified that he attended a meeting at Strong Memorial Hospital. After speaking with Ms. Quivey and others, Dr. Conti concluded that Lara's educational program was suffering immeasurably (Item 68, Vol. 1, p. 107). In light of the new information received, the COH met again on February 27, 1985. The COH concluded that Lara could not function in a regular classroom, and recommended that she be placed in an educational residential facility.

Following this recommendation, application was made to several residential educational programs in New York State. Rosalie Wiggle, coordinator of the Buffalo COH, testified that she called nine schools located within the State, and then sent applications to six of those schools which sounded as if they might be appropriate for

---

1. 20 U.S.C. § 1401(a)(19) provides:

   The term "individualized education program" means a written statement for each handicapped child developed in any meeting by a representative of the local educational agency or an intermediate educational unit who shall be qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of handicapped children, the teacher, the parents or guardian of such child, and, whenever appropriate, such child, which statement shall include (A) a statement of the present levels of educational performance of such child, (B) a statement of annual goals, including short-term instructional objectives, (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) the projected date for initiation and anticipated duration of such service, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

Lara. All six rejected Lara's application.[2] At that point, Ms. Wiggle sent an application to the Devereaux Foundation, which provides, among other things, an educational residential placement for emotionally disturbed children. Lara was accepted (Item 68, Vol. 1, pp. 68–70).

Since the Devereaux Foundation is an out-of-state private school, the COH could not, under New York law, effectuate Lara's placement without the approval of the Commissioner of the New York State Education Department. NY Educ.Law § 4401(2) and 4402(2)(b)(2) and (3). (*See* Decision of February 27, 1986 (Item 52).) Ms. Wiggle testified that she sent the acceptance letter from Devereaux, along with the six letters of rejection from New York State schools, to the State Education Department [SED], and requested that Devereaux be approved as a placement for Lara.

According to Ms. Wiggle, in the ordinary course, the State Education Department returns a copy of the application and acceptance letter from a school with a stamp of approval from the State Educational Department's regional associate. She testified that in her experience, there had never been a rejection by the regional associate. Ms. Wiggle has been the coordinator for the Buffalo COH for seven years. In Lara's case, however, the regional associate called Ms. Wiggle on April 16, 1985, to advise her that Lara's placement at Hedges would not be approved. Three days later, Ms. Wiggle received a letter from the State Education Department, stating that the Hedges Treatment Center of the Devereaux Foundation, where Lara was to be placed, was closed to new admissions. The SED Regional Associate suggested that the Committee apply to three additional schools in New York State.

Ms. Wiggle testified that she applied to these schools as suggested, but all three rejected Lara's application.[3] Ms. Wiggle testified that she did not contact the regional associate again after receiving these three rejections, because the Antkowiaks privately placed Lara at Hedges in May of 1985 (Item 68, Vol. 1, p. 79).

While the COH was in the process of applying to private schools in New York State, Strong Memorial Hospital informed the Antkowiaks that Lara would have to be discharged. According to Dr. Antkowiak, the hospital had threatened to begin legal proceedings to have Lara placed in a foster home by the end of April. On April 23, 1985, plaintiff brought this action, seeking an order directing the New York State Education Department to place Lara at the Devereaux Foundation. Plaintiff also moved for interim injunctive relief ordering Strong Memorial Hospital, originally a co-defendant in this suit, to refrain from discharging Lara until an alternative placement was found. After the lawsuit was filed, State officials advised Dr. Antkowiak to apply to two additional programs, both residential treatment facilities.

Residential treatment facilities are essentially mental health facilities which may have an educational component, according to Hannah Flegenheimer, Director of the Division of Program Monitoring with the SED's Office for the Education of Children with Handicapping Conditions, who testified for defendant.[4] Placement at residential treatment facilities may be funded jointly by the SED and the New York State Office of Mental Health; application for placement in such a facility is made to the Office of Mental Health (Item 68, Vol. 3, pp. 113–18). Residential Treatment Facilities differ from educational residential programs, which are designated as "schools"

**2.** The six schools that initially rejected Lara were Randolph, Hillside, Gustavus Adolphus, Gateway Methodist Home, Wyndham Lawn, and Hopevale (Item 68, Vol. 1, p. 69).

**3.** The three additional schools were the Convalescent Home for Children, the Anderson School, and the Rhinebeck County School (Item 68, Vol. 1, p. 7).

**4.** At trial, counsel for defendant stated that some children who are placed in residential treatment facilities receive their education outside the facility, occasionally at the local community school.

by the SED. Placement at an educational residential program is paid by the SED and governed by the terms of the IEP, designed by the local Committee on the Handicapped (Item 68, Vol. 3, pp. 143–44).

Although the Buffalo Committee on the Handicapped recommended an educational residential placement for Lara, Dr. Antkowiak submitted an application to the State Office of Mental Health and contacted the two residential treatment facilities recommended by state officials: the Hillside facility in Rochester, New York, and the Parsons Facility in Albany, New York (Item 68, Vol. 1, p. 26). Dr. Antkowiak and Dr. Alabiso visited both facilities. After meetings and discussions with administrators at each facility, they were told that the program could not meet Lara's needs—either physically, educationally, or emotionally (Item 68, Vol. 1, pp. 27–28). After receiving this information, Dr. Antkowiak withdrew his application with the Office of Mental Health (Item 68, Vol. 1, p. 40).

Faced with the threat that Lara would be discharged from the hospital and with no further suggested placements from representatives of the State, the Antkowiaks privately placed Lara at the Hedges Treatment Center of the Devereaux Foundation on May 15, 1985. During trial, counsel for defendant conceded that no educational residential facility in New York State was identified as appropriate for Lara, and that neither of the two residential treatment facilities in New York State recommended for Lara was appropriate (Item 68, Vol. 1, pp. 43–49).

After Lara was placed at the Hedges Treatment Center, Strong Memorial Hospital was dismissed as a defendant in this action. Plaintiff moved for a preliminary injunction ordering the SED to place Lara at Hedges. I denied plaintiff's motion for injunctive relief, 621 F.Supp. 975 (Item 31). I found that plaintiff failed to exhaust administrative remedies before turning to state or federal court, as is required by the EHA. 20 U.S.C. § 1415(e)(2).

Plaintiffs then requested that the Board of Education appoint an impartial hearing officer, pursuant to NY Educ.Law § 4404(1).[5] On December 26, 1985, the hearing officer issued a decision in favor of plaintiff, in which she found that Lara was emotionally disturbed and in need of educational residential placement. Although noting that a hearing officer usually lacks the authority to place a child at a facility which is not approved by the Commissioner of the New York State Education Department [the Commissioner], the hearing officer ordered Lara's placement at Hedges, since no appropriate placement could be made from the approved list (*see* Appendix to Order of July 11, 1986, 638 F.Supp. 1564 (Item 63)).

In light of this favorable decision, plaintiff renewed the application in this court for a preliminary injunction ordering defendant to effectuate Lara's placement at Hedges. The SED still declined to place Lara at Hedges, and contended that plaintiff had yet to exhaust his administrative remedies through an appeal to the Commissioner. NY Educ.Law § 4404(1). I found that plaintiff had satisfied the exhaustion requirements under the EHA (Order of February 3, 1986 (Item 45)).

The EHA provides that parents must have an opportunity for a due process hearing, to be conducted through either the local educational agency or by the state

---

5. NY Educ.Law § 4404(1) provides:

If the recommendation of the committee on the handicapped is not acceptable to the parents or guardians of a child, or if the committee fails to make a recommendation within such period as may be required by regulations of the commissioner, such parents shall notify the board of education of this situation and the board shall appoint an impartial hearing officer to hear the appeal and make a recommendation to the board of education within such period of time as the commissioner by regulation shall determine. Individuals so appointed by a board of education shall be selected from a list of those who have successfully completed a hearing officer training program conducted by the department according to the regulations of the commissioner. A record of proceedings before the hearing officer shall be maintained and made available to the parties. An appeal to the commissioner of education will lie from any determination of the board of education.

educational agency. 20 U.S.C. § 1415(b)(2).[6] New York chose to have the hearing at the local level. NY Educ.Law § 4404(1); *see also* 638 F.Supp. at 1568. This decision is final unless appealed by a party aggrieved by the decision. 20 U.S.C. § 1415(c),[7] 34 CFR § 300.509. *See also* 20 U.S.C. § 1415(e).[8] Here, neither plaintiff nor the local school district was aggrieved, and I found that plaintiff was not obliged, pursuant to federal law, to appeal the hearing officer's decision to the Commissioner. (Order of February 3, 1986, Item 45).)

On February 11, 1986, defendant New York State Commissioner of Education issued an order to show cause why the decision of the hearing officer should not be annulled pursuant to NY Educ.Law § 310. For the reasons set forth in the order of February 27, 1986 (Item 52), I deferred decision on plaintiff's motion for preliminary relief, pending the decision of the Commissioner. The Commissioner was permitted to review the hearing officer's decision in light of the partial approval status of the Hedges Treatment Center. It was hoped that the Commissioner would determine the propriety of Hedges for Lara Antkowiak, or suggest an alternative placement.

The Commissioner's decision was issued on March 14, 1986. He found that Lara had no "educationally handicapping condition" (*see* Appendix to Order of July 11, 1986, 638 F.Supp. 1564 (Item 63)). Following the issuance of the Commissioner's decision, plaintiff moved for partial or full summary judgment. I found that the decision of the hearing officer was final as to whether plaintiff was handicapped and in need of special education (638 F.Supp. 1564, (Item 63)). I also found that, to the extent it provided for special education and related services, the IEP designed by the COH and approved by the hearing officer was final.[9] Plaintiff was granted partial summary judgment on these issues. Since the Commissioner improperly annulled the deci-

---

**6.** 20 U.S.C. § 1415(b)(2) provides:

Whenever a complaint has been received under paragraph (1) of this subsection, the parents or guardian shall have an opportunity for an impartial due process hearing which shall be conducted by the State educational agency or by the local educational agency or intermediate educational unit, as determined by State law or by the State educational agency. No hearing conducted pursuant to the requirements of this paragraph shall be conducted by an employee of such agency or unit involved in the education or care of the child.

**7.** 20 U.S.C. § 1415(c) provides:

If the hearing required in paragraph (2) of subsection (b) of this section is conducted by a local educational agency or an intermediate educational unit, any party aggrieved by the findings and decision rendered in such a hearing may appeal to the State educational agency which shall conduct an impartial review of such hearing. The officer conducting such review shall make an independent decision upon completion of such review.

**8.** 20 U.S.C. § 1415(e) provides:

(1) A decision made in a hearing conducted pursuant to paragraph (2) of subsection (b) of this section shall be final, except that any party involved in such hearing may appeal such decision under the provisions of subsection (c) and paragraph (2) of this subsection. A decision made under subsection (c) of this section shall be final, except that any party

may bring an action under paragraph (2) of this subsection.

(2) Any party aggrieved by the findings and decision made under subsection (b) of this section who does not have the right to an appeal under subsection (c) of this section, and any party aggrieved by the findings and decision under subsection (c) of this section, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy. In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

**9.** Although the decision and order of July 11, 1986, granted partial summary judgment to plaintiff based upon the finality of the hearing officer's decision, I noted that Lara Antkowiak meets the federal definition of "seriously emotionally disturbed." 638 F.Supp. 1564, 1570 n. 10 (Item 63). The testimony at trial further supports the conclusion that Lara's condition adversely affects her educational performance so that she needs special education and related services.

This case is somewhat unique in that Lara has a very high I.Q. and has been capable of

sion of the hearing officer on these grounds and suggested no appropriate placement for Lara, his decision was not considered by the court. In taking this action, defendant breached the procedural safeguards set forth in the EHA. *See* 20 U.S.C. § 1415(a).

In the order of July 11, 1986, (638 F.Supp. 1564) granting partial summary judgment to plaintiff, certain issues were delineated for trial: a) the availability of alternative placements; b) the suitability of Hedges to meet Lara's needs; c) the approval status of the various components of the Devereaux Foundation; and d) whether the services Lara receives at the Hedges Treatment Center are educational, medical, or related services.

### A. Availability of Alternative Placements

Most significantly, no other program has been identified as appropriate for Lara

Antkowiak, either at an educational residential facility or at a residential treatment center. Throughout this action the court has pressed for defendant's recommendation as to an appropriate alternative placement for Lara. None was made.[10]

During summations, counsel for defendant was asked whether defendant urged that there was an available alternative placement for Lara, or whether that argument was out of the case. He responded: "As far as any specific placement, yes. I'm not making any argument, I'm not identifying any other placement to which the court should direct placement." [11]

### B. Suitability of Hedges Treatment Center for Lara

Counsel for defendant also acknowledged that defendant does not claim that Hedges is "necessarily an inappropriate or

---

superior academic performance. Furthermore, Lara's profound emotional and physical problems alone clearly necessitate institutionalization. Nonetheless, without institutionalization and special education, Lara derived no benefit from any educational program.

A passage from a recent Seventh Circuit decision is particularly apt:

[t]he child cannot be cared for at home because of some purely physical problem, neither can he be educated unless he is institutionalized. See *Irving Independent School District v. Tatro,* [468] U.S. [883], 104 S.Ct. 3371, 3378 n. 11, 82 L.Ed.2d 664 (1984). Maybe he requires continuous medical attention which he could not get in a regular day school. So he must be institutionalized for educational reasons but equally for medical reasons. If one analogized the failure to reimburse the living expenses of such a child to a common law tort, the conclusion would be that the state was not liable for them; if the child will have to live in an institution anyway, regardless of educational needs, those living expenses are not caused by his educational needs, for they will be incurred whether or not any effort is made to educate the child. Cf. *New York Central R.R. v. Grimstad,* 264 Fed. 334 (2d Cir.1920); *Weeks v. McNulty,* 101 Tenn. 495, 48 S.W. 809 (1898); Prosser and Keeton on the Law of Torts § 41, at pp. 256–66 (5th ed. 1984). But the Education for All Handicapped Children Act is not a tort statute, and to read it as one would lead to the odd result that the more the child's

handicap interfered with his living, and not just with his education, the more his parents would have to pay.

\*   \*   \*   \*   \*   \*

[T]he courts that have considered the question have rejected the argument that a state can avoid its obligations under the Act by showing that the child would have had to be institutionalized quite apart from educational needs that also required institutionalization.

*Parks v. Pavkovic,* 753 F.2d 1397, 1405–06 (7th Cir.1985 (citations omitted).

10. In April of 1985, while Lara was still at Strong Memorial, Hannah Flegenheimer suggested that Lara be placed at the Buffalo Psychiatric Center until another placement could be found, possibly at another residential treatment or psychiatric facility (Defendant's Exh. 4, Plaintiff's Exh. 8). During summation, counsel for defendant was asked whether defendant urges that placement at the Buffalo Psychiatric Center is or would have been appropriate for Lara. He replied that that is not the defendant's position. Counsel noted that, at that time, the SED was trying to be helpful while relying on its position that Hedges was not approved.

11. During summations, defendant maintained its position that the State Education Department is under no duty to provide placement for Lara because she is not handicapped so as to need special education under the EHA. *See* Decision of Commissioner Ambach dated March 14, 1986 (Item 63, Appendix 2).

bad place for Lara." After considering the evidence adduced at trial, it is clear that the Hedges Treatment Center is a suitable placement for Lara and meets most, if not all, of her needs, as set forth in the IEP (Plaintiff's Exhibit 2).

The Hedges Treatment Center is located on the Mapleton Campus of the Devereaux Foundation. At trial, Kenneth Tenley, the Unit Administrator for the Mapleton Campus, described the three components of the campus. The Hedges Treatment Center is a residential unit for severely emotionally disturbed children. There are currently about 60 residents at the Hedges Treatment Center, which has separate dormitories for boys and girls. Lara resides with five other girls in a cottage, the least restrictive dormitory.

Most students who are at the Hedges Treatment Center attend the Hedges School, which is part of the treatment center. About 5 percent attend one of three alternative schools. Lara Antkowiak receives the academic portion of her program at the Devereaux Day School. The Day School is located on the Mapleton Campus, about 150 yards from the Hedges Treatment Center. Approximately 85 students attend the Devereaux Day School; most of these students are emotionally disturbed children who live at home and are bused to school each day from the surrounding communities. The school has certified special education teachers and support services, such as behavior management. About five students who reside at the Hedges Treatment Center attend the Day School.

According to Mr. Tenley, the decision to place Lara at the Devereaux Day School, rather than the Hedges School, was based on her age. He testified that Lara was too young, both in age and grade level, for the Hedges School and that she has a more appropriate peer group at the Day School. Both the Hedges Treatment Center and Devereaux Day School are approved by the Pennsylvania Department of Education as educational facilities.

During the trial, Mr. Tenley also testified as to how Hedges meets the goals de-scribed on Lara's Phase 1 IEP (item 68, Vol. 3, pp. 40–46). She receives psychological counseling services and recreational services, as required by the IEP. The IEP also requires instruction in a non-competitive, small-group setting. These needs are met at the Devereaux Day School. Lara's classes average about eight in size. According to Mr. Tenley, because Lara is so bright, much of her work is individualized; she does not face competition with other students. She is also achieving some of the goals set out in the IEP. Lara's teachers believe that her obsessiveness with perfection in her school work has decreased. Mr. Tenley testified that Lara has completed her sixth and seventh grade requirements, and her relationship to her peers is increasingly improving.

## C. *Approval Status of Devereaux Foundation*

■ Although the Hedges Treatment Center is an appropriate placement for Lara, it is not fully approved as an educational residential placement by the SED. Pursuant to the EHA, a State must determine whether private schools and facilities meet standards that "apply to State and local educational agencies and that children so served have all the rights they would have if served by such agencies...." 20 U.S.C. § 1413(a)(4)(B)(ii). Under New York Education Law, students may be placed at private, out-of-state schools only if those facilities are approved by the Commissioner of the New York State Department of Education. NY Educ.Law §§ 4401(2) and 4402(2)(b)(2).

Ms. Flegenheimer testified that her office is responsible for monitoring all out-of-state private schools for compliance with all applicable rules and regulations. It also approves the placement of individual students at the schools if recommended by their school districts. (Item 68, Vol. 3, p. 85). Ms. Flegenheimer explained that when a private or out-of-state school seeks approval by the SED as a new program for New York State students, it must file an extensive application. If a school is ap-

proved, it is placed on the "approved list," which is circulated to the school districts in New York State every year or year and one-half. When a school appears on the approved list, according to Ms. Flegenheimer, it indicates to the local school district that the program is eligible for contracting for the education of New York State handicapped students. Schools are reviewed approximately every three years.

In the SED's October 1983 approved list (Plaintiff's Exhibit 3), the Devereaux Foundation of Pennsylvania was listed as an approved residential school serving children aged 6–21 who suffer from emotional disturbances, autism, and mental retardation. It was noted that 141 New York State students were enrolled at Devereaux, with 137 paid for by public funds and 4 privately placed. As Ms. Flegenheimer testified, the Foundation was listed as a single entity; there was no differentiation between campuses.

A new approved list was published in May of 1985 (Plaintiff's Exhibit 4). The Hedges Treatment Center of the Mapleton Campus received a separate listing for the first time. It was described as a coeducational facility serving severely emotionally disturbed children, ages 13–21. Alongside the listing in capital letters appeared the phrase, "Closed to new admissions." The May list was not received by the Buffalo COH until June of 1985 (Item 68, Vol, 1, p. 86). Ms. Wiggle was told for the first time in mid-April 1985 (when the SED turned down Lara's application for placement at Devereaux) that Hedges' approval status was limited.

Ms. Flegenheimer testified that the Hedges Treatment Center was closed to new admissions, in part, because the school at Hedges was not licensed by the State of Pennsylvania. Ms. Flegenheimer noted that New York State regulations require that a school be licensed in its home state in order to be approved as a school by the SED. There were also questions about the use of seclusion rooms at Hedges. She testified that the SED also was concerned about a Pennsylvania law which the Devereaux Foundation interpreted as requiring that children 14 and over be permitted to sign themselves out of treatment. Ms. Flegenheimer stated that the SED was concerned for the safety of New York students age 14 and over who might be permitted to leave the facility alone.

At the time the Hedges Treatment Center was closed to new admissions, there were already seven or eight New York students placed there. Ms. Flegenheimer testified that these students were permitted to remain at Hedges to avoid the disruption of their education. Only new admissions were precluded. It was hoped that the problems identified with Hedges might be resolved fairly quickly.

SED representatives first visited the facility in July of 1985, and returned for another visit in November of 1985.[12] As a result of that visit, the Hedges Center was reopened, effective January 3, 1986, for new admissions of students aged 14–21. All instances of non-compliance with New York law and regulations have been resolved.

Ms. Flegenheimer also testified that the Devereaux Day School is not approved by the SED.[13] According to Mr. Tenley, the Devereaux Foundation never sought New York State approval for the Day School, because it served primarily Pennsylvania day students and few out-of-state students attend the Day School. The Day School is licensed by the State of Pennsylvania.

**12.** One of plaintiff's representatives requested in early April that the SED site visit of Hedges, set for summer, be moved up to late April so that any approval issues might be resolved and Lara placed there. The SED declined to change the dates for the visit (Defendant's Exh. 4).

**13.** It should be briefly noted that in a 1983 program review of Devereaux, at page 4, it was noted that students who reside at Hedges might also be attending a day school within the Foundation, and not the Hedges School (Plaintiff's Exh. 6). This does not, as plaintiff would argue, amount to an implicit approval of the Devereaux Day School. It does indicate that defendant has been aware, since at least 1983, that Hedges students occasionally attend the Devereaux Day School.

Under certain circumstances, it may be appropriate for a court to order a child's placement in an unapproved or partially approved facility. *See Bevilacqua v. Board of Education of Niagara Falls,* CIV–79–550E, decided January 20, 1983 (W.D.N.Y.). In this case, as has been noted, the Devereaux Foundation had blanket approval when the COH first recommended that Lara be placed there. Ms. Flegenheimer agreed that none of the reasons given for the temporary hold on new admissions involved anything which would have affected Lara Antkowiak. Furthermore, the concerns about non-compliance were not serious enough to lead the SED to withdraw the seven or eight New York State students who had been residing at Hedges at the time of the hold on new admissions. All these concerns have now been resolved.

Although the Hedges Treatment Center was cleared for new admissions effective January 3, 1986, for children aged 14 and over, there has been no serious argument that Lara's age should preclude her from attending Hedges. In any event, Lara was 14 on February 11, 1987. Also, although she was only 12 when she was admitted to Hedges, the SED's acceptable age for admission at that time was 13 (Plaintiff's Exh. 3). Mr. Tenley testified that although Lara was a little young when she was admitted, the Center has made accommodations to meet her needs.

Defendant does point out that the Devereaux Day School has never been approved by the SED. However, it is important to note that the SED never found the Day School to be an unacceptable school; the school has simply never been reviewed for approval. Furthermore, Ms. Flegenheimer testified that SED regulations require out-of-state schools to be licensed by their home states, and the Devereaux Day School is licensed by the Pennsylvania Department of Education. Based on Mr. Tenley's testimony, the Devereaux Day School is more suited to Lara's needs than the Hedges School, which is approved. Both appear to offer similar services, except that the Hedges School serves mainly high school students, and Lara will not be at the high school grade level until next year. In addition, Mr. Tenley testified that there have been students from New York State who resided at the Hedges Treatment Center but received their educational program at the Day School, with full funding by the State of New York.

There is no indication that Lara is not receiving all the benefits and rights at Hedges that she would receive at a New York State school. 20 U.S.C. § 1413(a)(4)(B)(ii). On the facts of this case, the partial approval status of the Hedges Treatment Center does not preclude this court from ordering Lara's placement.

### D. *Nature of Services Lara Receives*

Both educational and related services are considered part of the "free appropriate public education" guaranteed to children under the EHA. 20 U.S.C. § 1401(a)(18).[14] A handicapped child is entitled to special education [15] and related services.[16] Related

14. 20 U.S.C. 1401(a)(18) provides:
  The term "free appropriate public education" means special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title.

15. 20 U.S.C. § 1401(a)(16) provides:
  The term "special education" means specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a handicapped child, including classroom instruction, instruction in physical education, home instruction, and instruction in hospitals and institutions.

16. 20 U.S.C. § 1401(a)(17) provides:
  The term "related services" means transportation, and such developmental, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, and medical and counseling services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a

services include support services, such as speech pathology, audiology, psychological services, counseling, and physical therapy. Certain medical services are excluded from coverage. 20 U.S.C. § 1401(a)(17) (*see* footnote 16). *Irving v. Tatro,* 468 U.S. 883, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984). Diagnostic and evaluative services are covered, but other medical services, when provided by a physician (or psychiatrist) are not. *Id.* at 894, 104 S.Ct. at 3379.

Although the nature of the services received by Lara was one of the issues left open for trial, defendant made no argument on this point in its post-trial brief or during summations. At trial, Mr. Tenley testified that Lara attends two individual and two group counseling sessions per week. Counseling and psychological services are considered to be related services when provided by a psychologist, social worker, or other professional. 34 CFR § 300.13(b)(8). Even psychotherapy has been found to be a related service when provided, on a daily basis, by a social worker under the supervision of a psychiatrist. *TG and PG v. Board of Education of Piscataway,* 576 F.Supp. 420, 423–24 (D.N.J.1983), *aff'd without opinion,* 738 F.2d 425 (3d Cir.), *cert. denied,* 469 U.S. 1086, 105 S.Ct. 592, 83 L.Ed.2d 701 (1984).

█ Mr. Tenley testified that no direct counseling is provided to Lara by the psychiatrist at Hedges. Lara works with a clinical psychologist. The psychiatrist at Hedges does a periodic evaluation of Lara's emotional condition and, when Lara first arrived, routinely evaluated her medication schedule. The limited diagnostic and evaluative services performed by the psychiatrist at Hedges for Lara are permitted medical services under the EHA. 20 U.S.C. § 1401(a)(17). Defendant has never argued that these services are not permissible under the EHA. Lara's parents pay independently for all medical services provided by her physician.

The related services a child receives must be needed in order to permit the child to

derive some benefit from her educational program. *Irving v. Tatro, supra.* Before Lara entered Hedges and received this attention, she was not functioning educationally. She was withdrawn in class, would not complete packets from her school, and, because of her severe emotional disturbance, was unable or unwilling to work with her special education tutor. In light of the testimony of Dr. Alabiso, Mr. Tenley, Dr. Conti, and Ms. Quivey, I conclude that the related services received by Lara, especially counseling, were and are necessary to enable her to derive any benefit from the special instruction she receives at Hedges and the Devereaux Day School.

█ Defendant is required by the EHA to provide a free, appropriate education to Lara Antkowiak. Defendant does not dispute, and I so find, that the Hedges Treatment Center and the Devereaux Day School is a suitable placement for Lara and satisfies the requirements of her IEP. The services she receives there are educational and related services. Defendant does not point to any appropriate alternative placement, either at an educational residential program or at a residential treatment facility. Yet, despite this and the decision of the COH and the hearing officer that Lara is a handicapped child in need of special education and related services at a residential program, defendant has refused to provide Lara with the free, appropriate education to which she is entitled under the EHA.

Counsel for the defendant suggested that relief, if granted, be conditioned upon the parents returning to the COH for a new IEP. New York law requires that the COH evaluate the status of a handicapped child at least annually. NY Educ.Law § 4402(1)(b)(2). The Buffalo Committee on the Handicapped did not review Lara after the Phase 1 IEP was prepared in February of 1985. As Ms. Wiggle testified, the Phase 1 IEP includes a classification for the child, a brief description of the program

handicapped child to benefit from special education, and includes the early identification

and assessment of handicapping conditions in children.

the child will need and any related services, and the goals for the child. A Phase 2 IEP is prepared after the child is already in the program, and expands upon the Phase 1 IEP, including more detail (Item 68, Vol. 1, pp. 75–77). The COH reviews the IEP annually and, if necessary, prepares a new IEP (Item 68, Vol. 1, p. 80).

When a child is privately placed, however, the IEP is not reviewed unless the parents request it (Item 68, Vol. 1, p. 89). Here, the Antkowiaks did not request it. Only a Phase 1 IEP was prepared. In addition, Ms. Wiggle testified that since the parties were in litigation, no review was undertaken. Counsel for defendant stated that he does not fault the parents for failing to seek any review of the IEP while the case has been in litigation. However, he points out that both Dr. Antkowiak and Dr. Albasio testified to an improvement in Lara's condition, and that perhaps a new IEP is necessary, since Lara may not need the level of care found to have been necessary two years ago.

Both John Antkowiak and Dr. Alabiso testified that Lara has improved significantly since being placed at Hedges and could potentially be released after June of 1987. Dr. Alabiso testified that Lara's anorexia is in remission. She has begun to open up emotionally and is making a few friends among her peers. She is functioning educationally. Dr. Alabiso cautioned, however, that Lara is in a period of transition and needs more time in an educational residential faciity before she can function successfully in a less-controlled environment, without risk of relapse (Item 68, Vol. 2, pp. 25–30). Mr. Tenley also testified that Lara still requires the services she receives at Hedges. Although she has improved, Lara is now in a transitional phase, and the risk of a relapse is significant.

I decline to condition relief upon the drafting of a new IEP. Since a Phase 2 IEP, which is ordinarily prepared shortly after the child enters the program, was never prepared for Lara Antkowiak, the Buffalo COH may prepare one to reflect Lara's current program at Hedges. The parents and the COH will perform an annual review of Lara's IEP consistent with applicable regulations. The court understands that an annual review is usually done at the end of each academic year.

Defendant shall immediately effectuate the placement of Lara Antkowiak at the Hedges Treatment Center of the Devereaux Foundation at no expense to her parents.

*Reimbursement*

Plaintiff seeks reimbursement for Lara's tuition from the date she was placed at Hedges throughout the date of this decision. Defendant claims that under the eleventh amendment of the United States Constitution, this court lacks jurisdiction to make a retroactive award of money damages.

The Hedges' tuition costs, which includes both the educational and residential programs, was $4,200 per month for private placements, effective September 1, 1986. Before that date, tuition was $3,575 per month (Item 68, Vol. 1, p. 62). Plaintiff does not seek reimbursement for the summers of 1985 or 1986. Lara's tuition for the months of July and August of 1985 was paid pursuant to an order of a Family Court Judge in New York State (Plaintiff's Exhibit 1). Mr. Tenley testified that her tuition for the summer of 1986 was also provided for. He also noted that, had Lara been placed by the SED, her tuition costs would have been approximately $2,800 per month based upon agreements between the Devereaux Foundation and the State of New York. Item 68, Vol. 3, p. 49.

■ Education authorities may be ordered to fully reimburse parents for their expenses in privately placing a child, should it ultimately be determined that the placement selected by the parents was proper under the EHA. *Burlington School Committee v. Department of Education of the Commonwealth of Massachusetts*, 471 U.S. 359, 105 S.Ct. 1996, 2002–03, 85 L.Ed.2d 385 (1985). In *Burlington*, reimbursement was sought from the local school, not an officer or agency of the state, and so the eleventh amendment

1418

did not apply. Defendant in the instant case, however, is the Commissioner of the State Education Department, which raises questions as to the court's authority to order reimbursement.

The eleventh amendment has been broadly read to deprive federal courts of jurisdiction to hear claims brought by a private party against a state, unless the state consents to suit. *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 99, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1983). While the state cannot be sued in its own name, it is well established that state officials may be sued in federal court for violations of federal law. If found to have been acting in contravention of federal law, the state official may be ordered to conform his future conduct to that law. *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

However, when the relief sought is retroactive money damages, the suit may be barred by the eleventh amendment even though the state is not formally named as a party. In those cases, the state has been viewed as a real party in interest, since the money damages will be ultimately paid by the state. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). The parties agree that, since the reimbursement sought here would come from the state treasury, the *Edelman* line of cases makes the State of New York a real party in interest.

There are, however, instances in which the eleventh amendment will not bar suit against the state. A state may consent to suit in federal court. *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 105 S.Ct. 3142, 3146–47, 87 L.Ed.2d 171, *reh. denied,* —— U.S. ——, 106 S.Ct. 18, 87 L.Ed.2d 696 (1985). In this case, there is no claim that the State of New York formally consented to suit in federal court. There can be no implied consent, since the Supreme Court has held that a state does not waive its immunity to suit by participating in a federal program, such as the EHA, through which it receives federal funding. *Florida Dept. of Health v. Flor-*

*ida Nursing Home Association,* 450 U.S. 147, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981) (*per curiam*).

Even if a state does not consent to suit in federal court, Congress may, when acting pursuant to section 5 of the fourteenth amendment, override the eleventh amendment. In enacting the EHA, Congress was acting pursuant to its powers under section 5 of the fourteenth amendment "to enforce, by appropriate legislation, the substantive powers of the fourteenth amendment." *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976). As was clearly stated by Congress in the preamble to the EHA, the Act was passed to "assure equal protection of law," 20 U.S.C. § 1400(b)(9); *Smith v. Robinson,* 468 U.S. 992, 104 S.Ct. 3457, 3486, 82 L.Ed.2d 746 (1984), as guaranteed by the fourteenth amendment.

The issue is whether Congress chose, in the exercise of its fourteenth amendment powers, to abrogate the states' eleventh amendment immunity when it enacted the EHA. The Supreme Court has recently held that Congress may abrogate the eleventh amendment "only by making its intention unmistakably clear in the language of the statute." *Atascadero,* 105 S.Ct. at 3147.

In *Atascadero,* the statute at issue was the Rehabilitation Act, 29 U.S.C. § 794. The question was whether, pursuant to the Rehabilitation Act, a state could be ordered to pay retroactive money damages. The Rehabilitation Act provides that no program or activity which receives federal financial assistance shall discriminate against a handicapped individual on the basis of his handicap. The statute also provides remedies for those aggrieved by any act or failure to act by "any recipient of Federal assistance." 29 U.S.C. § 794a. Among the remedies provided is a right to bring an action in federal court. Section 794a, referring to 42 U.S.C. § 2000e–16 and 5(f)–(k).

The *Atascadero* Court noted that states are among the class of recipients of federal aid under the Rehabilitation Act. How-

ever, the Court went on to state: "A general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment." *Id.* at 3149. The Rehabilitation Act was held not to abrogate the eleventh amendment.

The Rehabilitation Act makes no explicit mention of states in the text of the statute. On the contrary, the EHA is addressed to the states. In *David D. v. Dartmouth School Committee*, 775 F.2d 411 (1st Cir. 1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1790, 90 L.Ed.2d 336 (1986), decided after *Atascadero*, the court distinguished the EHA from the Rehabilitation Act. Unlike *Atascadero*, *David D.*, *supra*, was not a reimbursement case; the eleventh amendment issue arose in the context of the applicability of state educational standards. However, the discussion is equally applicable to the instant action. The court stated:

In addition to the explicit comments within the statute itself and the Supreme Court's ruling that Congress considered itself to be acting under its fourteenth amendment powers to promote the equal protection of the law, there is other evidence of congressional intent to subject states to federal court jurisdiction. Unlike the remedies for violation of § 504 of the [Rehabilitation Act], which are broadly directed to "*any* recipient of Federal assistance," and include a broad range of institutions and organizations, the EHA is directed to one class of actors: states and their political subdivisions responsible for providing public education. *See, e.g.*, 20 U.S.C. §§ 1412, 1413; 34 C.F.R. § 300.2. This accords with the most basic of political knowledge that free public education is provided by and under the aegis of the states.

Under the federal Act and its implementing regulations, the State educational agency promises to ensure that it and its local educational agencies will provide at minimum a free appropriate public education. Part of these guaranteed rights is the due process complaint and hearing system which is to take cognizance of "*any matter* relating to" a dis-

abled child's education or procedural rights. The culmination of the state administrative appeals process is the right of any party "aggrieved" by the decision or procedure employed to take the matter to either state or federal court. 1415(e)(2). Obviously, since the state is responsible for guaranteeing that a child will receive both the substantive and procedural rights set forth in the Act, Congress intended that the State should be named as an opposing party, if not the sole party, to the proceeding.

*Id.* at 422. The court concluded that, in enacting the EHA, Congress "effectively abrogated the sovereign immunity of the states from suit in federal court." *Id.* at 422.

After careful consideration, I adopt the reasoning of the *David D.* court and conclude that, in enacting the EHA, Congress made its intention to abrogate the eleventh amendment unmistakably clear in the language of the statute. *Atascadero*, *supra* 105 S.Ct. at 3147. *See, in particular*, 20 U.S.C. §§ 1412(6) and (7), 1415.

Pursuant to *Burlington*, *supra*, plaintiff is entitled to reimbursement for the tuition he paid from the time Lara was placed at Hedges by plaintiff on May 15, 1985 (exclusive of July and August of 1985 and 1986, for which payment has been made). Defendant has had numerous opportunities to secure appropriate alternative placement for Lara, and has failed to do so.

To summarize, defendant shall immediately effectuate Lara Antkowiak's placement at the Hedges Treatment Center of the Devereaux Foundation at no expense to plaintiff. Defendant shall reimburse plaintiff for Lara Antkowiak's tuition from May 15, 1985, to the present, in accordance with this opinion. Plaintiff shall prepare a proposed judgment on five days' notice to the court and defense counsel.

So ordered.